Good morning, your honors. I'm Michael Barcott for CLMS Compellent here. I'd like to reserve two minutes, if I may. You may. We have a clock there and also I'll try to help you watch. Thank you. I have the clock on my screen, but it presumed a ten-minute argument, so I think it needs to be sent. Thank you. I'd like to spend just a minute. Yes, it is. Just to clarify, it is a ten-minute argument per side. Oh, I'm sorry. I was on the understanding this was fifteen minutes per side. You may proceed. Thank you. I'd like to spend just a minute or two, if I may, explaining to the court why we are here. What difference does it make to my client here in federal court or in arbitration? Because I think that understanding will help you understand why Washington has elected not to allow mandatory arbitration in insurance matters. One of the major issues in the underlying case is the calculation of deductible, and you'll find this at Lloyd's excerpt of record, page 22. By our calculation, the deductible is $600,000. We pay the first $600,000 and the insurance pays the rest. By Lloyd's calculation, it is $3,600,000. So that one issue is a $3 million issue. Amicus, in this case, United Policyholders, have submitted a brief, and in that brief at pages five through nine, they discuss why arbitration of insurance matters may not be fair, and their point is so amply proven by the arbitration provision of this policy, and it shows the mischief that can be caused when one of the parties to the dispute gets to set the rules. If you look at excerpt of record 69, you'll find a portion of the insurance policy that discusses arbitration, and this is who our arbitrators will be if we go to New York. Quote, the arbitration tribunal shall consist of persons employed or engaged in a senior position in insurance underwriting or claims. We don't get to pick a neutral arbitrator. We've got to have insurance people. So simply put, your honors, this game has been rigged by Lloyd's, and we don't want to play it. Washington State very clearly prohibits mandatory arbitration in insurance policies. The James River case, which has been discussed in the brief, makes that clear. The only question in this appeal is whether that same rule applies to foreign insurers in light of the Federal Arbitration Act, and there's clear guidance provided to this court on how to approach this question, and the court starts as always with the words of the statute, and if the words of the statute are clear, there is no need to go on and discuss the intent of statutes. Mr. Barcott? Yes, Your Honor. I think that statute's very clear, and I'm a little worried about your time. So we know treaties can be self-executing, and non-self-executing, right? If I can cut to the chase, if you'd forgive me for doing that. Please do. And so my question is, since they can be both, what is your very best shot at convincing us that the provision we're focusing on, Article 2, Section 3, is non-self-executing? I have two shots that I'd consider equal, Your Honor. The first is the Mitsubishi case, which specifically calls out this treaty as a non-self-executing treaty, and I know that a couple of courts have indicated that this may be just dicta, but it's really good dicta, and it's not dicta that the Supreme Court just threw out some loose language. In the course of that case, it was important whether the treaties were self-executing or non-self-executing. So that's, that's, excuse me, Medellin, it's not Mitsubishi, it's the Medellin case. So that's your first argument. What's your second best shot? The second best shot, Your Honor, is if you will look at the convention itself, it's a hollow shell. If you were asked to apply that convention, and asked to tell us whether there was jurisdiction in federal court, where's venue, how is arbitration enforced, you couldn't find that in the treaty. You only find that convention itself. So why shouldn't we be concerned about what the solicitor had to say? I know you're very familiar with this record, and we've been all over it, so why shouldn't we be concerned with the solicitor's view, which is that treaties can be self-executing and non-self-executing, and that Article 2, Section 3, as you know, he took a strong position that because it speaks directly to the Because when you look at what President Johnson said, and what the Senate said when it was considering the Convention Act, that record is more important than a later solicitor, and the solicitor just accepted the ESAB case, and the Safety National case as properly decided, and as we've set forth in our brief, they were not properly decided. Each of them has a fundamental flaw. Well, I think I would go to your first argument, because in large part, you, of course, rely on the Medellin case, but then when you read the Medellin case, it really cites the Convention Act for something different than the self-executing treaty. It talks about the Convention Act meaning that international tribunals can be afforded a different status than they would otherwise. It's in a to Article 2, Section 3 of the treaty itself, where they then talk about self-executing treaties. So, I read Medellin not to come to the conclusion that you say, and maybe there's a specific part of that where you read it differently, and if so, it would be helpful to hear that, because I think we start with the language of the treaty, of course, and it's quite clear about directing the tribunals to hear these directly, but then we also go to the leading case, Medellin. So, I'd appreciate your comment on that. So, Your Honor, I'm looking at Medellin right now, and it refers specifically to Right, and it says that, but it's talking about them in a different context in that sentence than self-executing treaties, and that's my point. I see Section 201-208 referred to and agree with you that that's in the ambit of what we're talking about, but it doesn't seem that the Supreme Court came out and said, well, those sections and that convention is self-executing. It, in the very first sentence of that paragraph, it, of course, does say that in discussing these treaties that Congress is up to the task of implementing non-self-executing treaties, even those involving complex commercial disputes, and then drops down and mentions this treaty specifically in that same paragraph. I'm not sure you can leave the sentence we started off with without having the intro sentence of that paragraph in mind. Well, the concurring opinion in the Fifth Circuit did, Judge Clement did, and you're familiar with her reasoning, which is what Judge McEwen's getting at, and I'm waiting to hear your best answer. You just read it differently? You don't think there is a pivot there in that sentence, or what's your response, please? I don't think there's a pivot in that sentence, but more importantly, we go back to the convention and read that convention, and I would ask you if you had that convention in front of you and were asked, is there jurisdiction over these cases? You couldn't tell. Can these cases be removed? You couldn't tell. The solicitor's take on that is that some facilitating amendments had to be made. That's your mention of President Johnson. Of course, we go to the language of the treaty first before we go to legislative history, but you've got that to be sure, right? You've got that, but the problem is we've got this language. We go to the language, and it just seems to speak directly to the courts, and you don't see it there. You describe it as a general proclamation, I think. General proclamation that arbitrations are a good thing. Arbitration should occur, but there's no... In fairness, it also is a general proclamation. It's a direction that upon request, the arbitration agreement shall be enforced, isn't it? Yes. I mean, the thing is, this is not a horatory statement, it seems to me. It says, shall refer the parties to arbitration, and it says that the court of the contracting state would do that. You don't need Congress, in this case, like you do in many treaties, to actually adopt any implementing language, do you? You do, Your Honor. So what happens when that court, whichever court it might be, refers the matter to arbitration, and the arbitration is decided? Then what happens? And the arbitration is what? I just didn't quite hear. The arbitration occurs, and the question is, then what happens? What do you do with that arbitration award? What are the standards by which it is reviewed? What courts review it? There may be implementing legislation like that in the New York Convention and the Convention Act, but not to the referral to arbitration. So it may be that we just have a difference of how we view it. Your time is up, but we're going to give you some rebuttal time. We have let you exceed your time. Thank you very much. Good morning. My name is Colleen McCaffrey, and I'm here on behalf of certain underwriters at Lloyd's London and TJW and Associates. And we're here today to ask the court to enforce the parties' agreement to arbitrate. This is required not only by the parties' agreement, but by an explicit directive in the self-executing treaty and the Convention Act. We just want the court to do what the parties, the President, and Congress has told it to do. In contrast, appellants want this court to perform statutory gymnastics, to find that a state statute allows this U.S. court to breach the Convention. To do so, it relies on McCarran-Ferguson, which is a clear statement rule meant to tell us how to construe domestic law. It does not permit the appellants to circumvent clear directives in both the treaty and the Convention Act. Frankly, to do this would turn not only the supremacy clause, but the separation of powers doctrines on their head. And our first and our best argument is what this court has already touched on, and that is we are dealing with a straightforward application of the supremacy clause. We have a self-executing treaty, and we have a state statute. I don't think anyone here disputes that a self-executing treaty trumps a state statute. And I don't think anyone here disputes the fact that the President, with the consent of the Senate, can enter into a self-executing treaty. So I guess it comes to what's the difference between a self-executing treaty and a non-self-executing treaty. A self-executing treaty in this agreement among all the nations to do something, and it says we are going to do this thing, and normally that's a direction to the courts to enforce a specific provision. A non-self-executing treaty, in contrast, is a promise. It says we're going to undertake to comply. We're going to go back home and see if our legislatures can do this. So how do we know which category that falls in? And the way we know that is by looking at the treaty's language itself. And as this court has already touched on, the language we hear today is very clear. It says the court of a contracting state shall refer the parties to arbitration. I don't think that leaves any ambiguity. I think that this court has its directive from the President as enacted in the Convention Act. What is your response then to Mr. Barkat's arguments that, you know, arbitration is arbitration, but when you get there, there are a great deal of issues related to what rules apply, what happens when you have to enforce a judgment, that sort of thing. And all of those really rely on acts of Congress. Well, I would push back on that. I think that, you know, first off, we have to recognize that arbitration is a contractual agreement amongst the parties. And so if you look at what arbitration is, it's to get into a forum efficiently and expediously. And that's what this convention allows, and that's why it allows the court to go immediately into arbitration. As far as the other concerns I think the court is bringing, as far as the application or enforcement of an arbitration award, the convention provides for that. In other sections, it says, you know, you can apply to a court of another state or a court of your state to get it enforced. You know, I think that this court, and especially the Ninth Circuit, has made clear that some sections of a treaty can be self-executing and others may not be. So I think, you know, what we're here to look at today, there really is no ambiguity that as long as there's an arbitration provision in a policy between a foreign entity and someone here in the United States, it needs to be going to arbitration. And I'd also like to touch on this. Could you help me out on that part? Because I think Mr. Barkat does raise an interesting point. I mean, there is the Convention Act, and clearly it was legislative necessary, not just that it was predicted by President Johnson, but there was legislation necessary to implement, right? And the question is, is that implementing? Is it just facilitating? Notice that the solicitor used facilitate rather than implement. But it's not nothing. So the examples you gave definitionally of a self-executing treaty and a non-self-executing treaty I think sound exactly right. But this seems to be a bit more of a hybrid. Is there a case law that deals with a treaty that looks like this? I would point to the Ninth Circuit's case in Lettice v. United States. In that treaty, they start with the assumption that certain parts of a convention could be self-executing and others cannot be. And I think in speaking to, you know, there's a greater point here, and I want to touch on Medellin briefly, and that paragraph in Medellin, because I agree with this court. I think that that is dicta, and I don't think dicta can be used to overturn the explicit holding of the case. For instance, if the case says, look to the language, and if it's a directive to the courts using language like shall, I don't think dicta can be used to overturn that primary holding. But I think even more fundamentally, and if you take a step back, in that case, we were dealing with a non-self-executing treaty that had not been implemented by Congress. Here, regardless of the way you look at it, you know, I arguably think it's, I think it is a self-executing treaty, but it's also Congress has thrown its weight behind it. And it's been pretty clear when it's thrown its weight behind it. It says you shall apply the convention. And I think, you know, this kind of leads to the point or crystallizes a point that appellants have been making, is that McCarran-Ferguson allows reverse preemption of that. And I would just- Counsel, may I ask you a question on this point that you just mentioned? You just said you think this is a self-executing treaty. So does that mean that you agree with Judge Clement regarding the Article 3 of Medellin, that that must be the provision that the Supreme Court is referring to in that dicta? Or are you saying that you think this is a partially self-executing, partially non-self-executing treaty? Well, I would say, you know, frankly, I think that the part we're here to talk about today is self-executing. But to answer your question, I do think that other portions of the convention, while I would not concede that it's completely non-self-executing, I think that certain parts of the convention may not be self-executing. For instance, one of these sections about enforcing the award. And I want to briefly, if that answers your question, touch on the Convention Act itself. I think it's really important to remember what the Convention Act is doing and to read the language of the Convention Act. You know, McCarran-Ferguson applies to Acts of Congress. It doesn't apply to treaties. And that's just by the language of McCarran-Ferguson itself. And if we look at the Convention Act and we read it, you know, Section 201 through the entirety, throughout that, the language is separating between the convention and the statute itself. It's very clear to me when reading that. They say things like, if it falls under the convention, if the convention and if the statute contradict, you know, you should apply the convention. It's very clear to me that when Congress is enacting the Convention Act, it was considering the treaty to be a separate thing. And that's where the substantive law was coming from. I have a question for you on the way you're segmenting the treaty. Because you've indicated that this particular section, which is a mandatory directive to the courts, is self-executing, but other portions might not be. Whereas, do you have any cases where the courts have segregated and bifurcated treaties or trifurcated treaties? This is self-executing. This is not. This is. Do you have any support for treating the treaty clause by clause as opposed to holistically? So, I would, again, just refer the court to Leidas v. United States. And I don't know if that's directly answers your question. I don't believe, you know, the holding of that case may not be directly on point. But I will say that the introduction and the introductory paragraph to the analysis of that section does focus in on the fact that you do have to look at a treaty individually in a specific section that you're seeking to enforce. That's a really important point. It's basically going through and quoting the restatement and saying, you know, and I think the restatement's pretty clear on this, treaties, you know, can't, it doesn't mean that you're bifurcating it. But when you're looking at whether you're going to enforce something by its own accord, you really need to look at the language itself and the specific language that's at issue. And that restatement you're referring to is a restatement on foreign relations, not on international commercial arbitration. Is that right? I am not positive on the answer to that question, but I believe so, Your Honor. Thank you. And then I want to segue into a final point. We've touched a little bit on the Fifth Circuit. I mean, the Fifth Circuit's holding the respective acts of Congress and that the treaty is separate and the treaty is what's being construed. But I've got a little bit of limited time. So I also want to touch on what the Fourth Circuit said and ESAB group. And that's just in Garamondi, which is that the McKeown-Ferguson wasn't intended for international law. And that's, we see that again and again with the Supreme Court holding things, telling us that we can't strain to find a domestic statute conflicts with international law. It's really important that international law be predictable and there's comedy. And I want to say that that's really important in this instance. I think that the amicus brief wanted to distinguish between international insurers and domestic insurers. And the reason we touched on that on our brief is because they are different. We represent carriers that do risk through the Lloyd's market. That means that each of the members can do a portion of a risk and not the risk itself, meaning they can insure things that no one else here domestically will. And part of the reason they're willing to do that is because they can predict where they'll be hauled into court. And I think it's important to note here that everything about this case is in Texas. So I would beg the question, why are we here in Washington? And I think it's because of the statute we're here to talk about today. It's a Hurricane Harvey case and all of the evidence and all the documents and all of the exhibits. Right, but Mr. Barcott's response to that is we're here because your client was doing business here. Your client essentially sold a policy to people in Washington or an entity in Washington that owns that property. Well, I would say... Oh, I'm sorry. It does seem to me he's got a good response to that point. Sure, but I do think the fact is the reason that my clients are willing to do insurance for that is because they need to know if no one else will insure, they need to know where exactly they're going to be hauled into court. And part of that reason is they are insuring companies that are based out of certain locations with properties all over the country. And so, sure, that is the case that Mr. Barcott is arguing. But at the same time, the reason they're willing to do this is because of the predictability of that arbitration provision. Thank you, Ms. Caffrey. Thank you. Mr. Barcott, I would ask Ms. Rivera to put a minute on the clock. We already actually gave you a couple extra minutes, but you need some rebuttal time. Thank you very much. I will take that minute. My response to the solicitor's brief is in part also based on the Rubin's case, which is the only court directly to consider the question of whether this is self-executing or non-self-executing treaty. And it, of course, held it was not. The solicitor's brief is also faulty, and we set that out in our opening brief, in that it assumes that it doesn't make any difference for the application of McCarran-Ferguson whether this is self-executing or non-self-executing. I think from the questions the panel has asked, it understands the difference between those two things, because McCarran-Ferguson only applies to an act of Congress, and when you have an act of Congress, you then need to go through the McCarran-Ferguson analysis. The ESAB case, relying on Garamondi, just missed the point. McCarran-Ferguson, in its opening language, applies to every person engaged in insurance. It does not distinguish domestic and foreign insurance. So that language of that statute, frankly, does away with the ESAB case, which missed Garamondi. Garamondi is a very different situation. I see I'm over time, Your Honor, so unless there are other questions, I'll stop. It appears not. Thank you. I would like to thank both counsel for your arguments. You obviously are very familiar with the treaty, as well as the statutes and the underlying case law, and we appreciate that, as well as the very excellent briefs. The CLMS v. Amwins is now submitted.
judges: Hawkins, McKeown, Christen